UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| NICOLE PEIRSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | |
| CAROLYN W. COLVIN, acting Commissioner of the Social Security Administration, | ) | No. 1:12-cv-01841-WTL-TAB |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Nicole Peirson requests judicial review of the final decision of Defendant, Carolyn W. Colvin, Commissioner of the Social Security Administration ("Commissioner"), denying Ms. Peirson's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"). The Court rules as follows.

### I. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id*., and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in her decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into

[his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176.

## II. **BACKGROUND**

Nicole Peirson protectively filed for SSI and DIB on June 3, 2010, alleging she became disabled on February 1, 2009, primarily due to severe depression and panic attacks. Ms. Peirson was born on July 6, 1972, and she was thirty-three years old on the alleged disability onset date. Ms. Peirson obtained a GED and took classes through an online college, earning a two-year degree in Human Resources. She has prior relevant work experience as a telemarketer and in customer service.

Ms. Peirson's application was denied initially on August 30, 2010, and again upon reconsideration on October 28, 2010. Following the denial upon reconsideration, Ms. Peirson requested and received a hearing in front of an Administrative Law Judge ("ALJ"). A hearing, during which Ms. Peirson was represented by counsel, was held in front of ALJ William M. Manico on November 9, 2012. The ALJ issued his decision denying Ms. Peirson's claim on February 9, 2012. The Appeals Council also denied Ms. Peirson's request for review on October 26, 2012. After the Appeals Council denied review of the ALJ's decision, Ms. Peirson filed this timely appeal.

*Medical Evidence*

Ms. Peirson's medical evidence begins in August 2009, when she saw Dr. Hatimi, her primary care physician. Ms. Peirson complained of an earache, blurred vision, cough, vertigo, depression, anxiety, hallucinations, and fatigue. Dr. Hatimi diagnosed Ms. Peirson with endometriosis menorrhagia, hypertension, and sinusitis. Furthermore, he noted Ms. Peirson's nicotine abuse and family history of diabetes. Dr. Hatimi prescribed Depo-Provera, Veramyst,

3

and Claritin, in addition to ordering labs and an electrocardiogram. Ms. Peirson met with Dr. Hatimi again on September 14, 2009, for a follow-up appointment. She complained of depression and frequent urination; Dr. Hatimi thus prescribed Celexa and Detrol LA. He also recommended counseling for Ms. Peirson's depression.

On October 26, 2009, Ms. Peirson went to the Anderson Psychiatric Clinic complaining of depression, panic attacks, and anxiety. A Mental Status Examination was performed, and she was diagnosed with depressive disorder, panic disorder, and agoraphobia. She was also assessed a score of 48 on the Global Assessment of Functioning ("GAF") Scale. Ms. Peirson went to the Anderson Psychiatric Clinic several times thereafter, treating with Robert Hacks, a social worker. Her treatment at the Anderson Psychiatric Clinic concluded in June 2010 because Ms. Peirson "failed to return" and her "goals were partially achieved." Ms. Peirson's GAF at discharge had risen to a score of 55.

On November 11, 2009, Ms. Peirson met with Dr. Hatimi for a check-up. She explained that she was experiencing side effects from her medications; specifically, she was experiencing dizziness from Celexa. At the appointment, Ms. Peirson indicated having a medical history of anxiety and depression; however, during his evaluation, Dr. Hatimi noted that Ms. Peirson denied depression, anxiety, memory loss, mental disturbance, suicidal ideation, hallucinations, and paranoia. Nevertheless, Dr. Hatimi diagnosed Ms. Peirson with anxiety and depression. He advised her to continue taking Celexa and also prescribed Buspar for her anxiety.

Ms. Peirson met with Dr. Hatimi for another follow-up appointment in December 2009. She complained that the Buspar medication was not working. Dr. Hatimi diagnosed her with anxiety and prescribed Klonopin for her panic attacks.

In January and April of 2010, Hacks completed two 90-day Outpatient Psychiatric Reviews of Ms. Peirson that were reviewed by John Wenger, Ph.D. The Reviews contained DSM-IV diagnoses of anxiety, dysthymic disorder, and agoraphobia, as well as GAF scores of 48 and 51 respectively.

On April 20, 2010, Ms. Peirson met with Dr. Susan Anderson, a psychiatrist. She reported suffering from depression, constant crying, and panic attacks. Dr. Anderson diagnosed Ms. Peirson with panic disorder, agoraphobia, and depressive disorder. Dr. Anderson recommended that Ms. Peirson resume taking both Celexa and Xanax. Ms. Peirson met with Dr. Anderson again on May 11, 2010, for a follow-up appointment. She noted that her medications were starting to work because she was less irritable and her panic attacks decreased in severity.

Ms. Peirson met with Dr. Anderson twice in June 2010. At her June 8th appointment, she noted that she was suffering from visual hallucinations and had been for approximately one year. Dr. Anderson recommended that Ms. Peirson begin taking Navane. At her June 30th appointment, Ms. Peirson reported that the Navane was working.

In July 2011, Dr. F. Kladder, Ph.D., a State Agency doctor, diagnosed Ms. Peirson as having depressive and anxiety disorders. He opined that Ms. Peirson had the mental Residual Functional Capacity ("RFC") to perform unskilled work in a setting where her contact with other was limited. On August 17, 2010, Ms. Peirson underwent a Mental Status Evaluation at the request of the State Agency. Dr. Brandon Robbins, a licensed clinical psychologist, diagnosed Ms. Peirson with social phobia and major depressive disorder. He assessed her with a GAF score of 51. He noted that Ms. Peirson did have some limitations with regard to social interactions, and therefore concluded that she would benefit from a work environment where she

worked with only a few other individuals and that required minimal social interactions. Dr. Randal-Horton confirmed these conclusions in October 2010.

Ms. Peirson continued to meet with Dr. Anderson throughout 2011, although Dr. Anderson did note that Ms. Peirson missed several scheduled appointments. In February 2011, Ms. Peirson complained that her medication was not working and that she was feeling angry; Dr. Anderson adjusted Ms. Peirson's medication. In June 2011, Ms. Peirson admitted to Dr. Anderson that she had been hurting herself by burning her wrist with cigarettes and punching walls.

Ms. Peirson returned to the Anderson Psychiatric Clinic in June 2011 and saw Jean Manis, a social worker. Ms. Manis noted that Ms. Pierson suffered from depression, obsessive compulsive disorder, self-mutilation, anxiety, post-traumatic stress disorder, panic attacks, and agoraphobia.

In July 2011, Dr. Anderson filled out a Mental RFC Questionnaire. She diagnosed Ms. Peirson with post-traumatic stress disorder, panic disorder with agoraphobia, and personality disorder. Dr. Anderson noted Ms. Peirson's current GAF score was 50 and that her highest GAF score was 55. Dr. Anderson reported that Ms. Peirson had "minimal response to medication at this time" and noted her prognosis as "fair."

In August 2011, Dr. Anderson discontinued the Celexa and started Ms. Peirson on Effexor XR. In September 2011, Dr. Anderson noted that Ms. Peirson responded better to the Effexor XR.

*Hearing Testimony*

At the hearing, Ms. Peirson testified that she was unable to work due to severe anxiety, panic attacks, and depression. She testified that she lives with her three children and relies on

her daughter to prepare her meals. While she has a valid driver's license, she does not drive, but relies on others to transport her places. She also testified that she sleeps during much of the day, only waking up to take her medications, and does not leave the house at night. She testified that she was fired from her previous job because she missed work due to her panic attacks.

After Ms. Peirson concluded her testimony, the ALJ heard testimony from Jean Manis, a licensed clinical social worker with the Anderson Psychiatric Clinic, who began seeing Ms. Peirson in June 2011. She testified that Ms. Peirson suffered from hallucinations, obsessive compulsive disorder, depression, and post-traumatic stress disorder. She also noted that Ms. Peirson had burned her wrist with cigarettes.

The ALJ also heard testimony from the Vocational Expert ("VE"), Stephanie Archer. The ALJ asked the VE to consider a hypothetical individual with Ms. Peirson's age, education and work experience who could work with the following restrictions: working with a small number of people; working in a low-stress environment; and working in a position that allows for breaks approximately every two hours. The VE testified that such an individual could perform work as a packer, cleaner, and machine feeder.

### III. DISCUSSION

In her brief in support of her complaint, Ms. Peirson argues that the ALJ's finding at step five was not based upon substantial evidence in view of the entire record. To that end, she directs the Court to several alleged errors: 1) the ALJ incorrectly "corrected" Dr. Kladder's report; 2) the ALJ's conclusions regarding Dr. Anderson's Mental RFC Questionnaire were incorrect; and 3) the ALJ erred in failing to consider the testimony and treatment notes of Jean Manis. Ms. Peirson also alleges the ALJ erred in failing to amend her onset date. The Court will address her arguments below.

## A. Substantial Evidence

As noted above, Ms. Peirson contends that the ALJ's finding at step five—that she could perform other work in the national economy—is not supported by substantial evidence in the record. She advances two reasons, in addition to her other related RFC arguments discussed below. First, she argues that the ALJ only considered the reports of the State Agency psychologists, who did not have the advantage of reviewing Ms. Peirson's longitudinal record of mental health treatment. And second, she claims the ALJ improperly "jettisoned" her GAF scores.

The Court disagrees with Ms. Peirson that the ALJ only relied on Dr. Robbins, Dr. Kladder, and Dr. Randal-Horton's reports in crafting her RFC. The ALJ specifically noted that he "assign[ed] significant weight to . . . Dr. Anderson" in determining Ms. Peirson's RFC. R. at 25. While the State Agency physicians completed their reports in 2010, Dr. Anderson completed her report in 2011, and had "the advantage of reviewing the longitudinal record of Ms. Peirson's mental health treatment." Pl.'s Brief at 14-15. As the Court explains below, Dr. Anderson's report, along with the other reports and objective evidence in the record, supports the ALJ's RFC determination. *See Pepper v. Colvin*, 712 F.3d 351, 362-63 (noting substantial evidence exists when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal quotation marks omitted)).

In regard to her GAF scores, the Court does not agree with Ms. Peirson that the ALJ "simply disregarded the scores." Pl.'s Brief at 16. It is curious to the Court why the ALJ felt the

8

need to dedicate six repetitive footnotes in his decision to those scores.[1] Nevertheless, by placing them in his decision, he clearly did not disregard them. His footnotes simply reflect the fact that a certain GAF score, standing alone, does not automatically mean a claimant is disabled. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.") (quoting *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003)). The Court reads the ALJ's decision as considering Ms. Peirson's ranging GAF scores—from a high of 55 to a low of 40—as one piece of evidence he considered when determining her RFC. In so doing, the ALJ did not err.

### B. Correction of Dr. Kladder's Report

Ms. Peirson next takes issue with the ALJ "correcting" a Psychiatric Review Technique Form ("PRTF") completed by Dr. Kladder. In his decision denying benefits, the ALJ noted:

> In the PRTF (see 1A: 4), Dr. Kladder checks the *marked* box for social functioning. This would appear, however, *to be an error as he only indicates moderate limitations in his mental rfc* at 1A: 6 . . . Moderate restrictions are also consistent with Dr. Kladders's [sic] analysis at 1A: 6.

R. at 17, n. 3 (emphasis added).[2] Ms. Peirson made this same argument on appeal to the Appeals Council. The Appeals Council agreed with Ms. Peirson that the ALJ "erred in correcting Dr.

---

[1] The footnotes all read, "A GAF score of [insert score] is not indicative of disability. To the contrary, GAF scores are only an indication of one's function the day of assessment and provide no longitudinal application." R. at 16, 24.

[2] While noting "marked" limitations on page 4 of the PRTF, in terms of her social interaction limitations, Dr. Kladder noted on page 6 that Ms. Peirson was "moderately limited" in: 1) her ability to interact appropriately with the general public; 2) her ability to accept instructions and respond appropriately to criticism from supervisors; 3) and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. She was "not significantly limited" in her ability to ask simple questions or request assistance; and in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. R. at 74. The Court presumes this is why the ALJ assumed the "marked" classification was made in error.

9

Kladder's opinion statement, especially without recontacting him for clarification." *Id*. at 2. However, it upheld the ALJ's ultimate determination that Ms. Peirson was not disabled stating, "the evidence as a whole supports the finding that the claimant possesses only a moderate limitation in her social functioning." *Id*.

Ms. Peirson takes issue with one particular line in the Appeals Council's decision. It noted that "because the record as a whole still supports the findings made, *even if all of Dr. Kladder's statements are ignored*, we will not disturb the decision at this time." *Id*. (emphasis added). The Court agrees with Ms. Peirson that this line is perplexing. In the Court's view, the appropriate remedy would have been for the Appeals Council to note that even if the ALJ had taken Dr. Kladder's report *as is*, the record as a whole still substantially supported his conclusion that Ms. Peirson's social limitations were moderate. The problem, therefore, lies in the fact that the Appeals Council noted that the ALJ erred in "correcting" Dr. Kladder's report, but then failed to remedy that problem by simply ignoring the report all together.

While the Court believes that the ALJ's conclusion regarding Ms. Peirson's social limitations is well-reasoned, the Appeals Council failed to adequately address the "error" it claims he committed. Unfortunately, this requires remand. On remand, the ALJ should either contact Dr. Kladder to clarify the discrepancy, as the Appeals Council suggested, or reevaluate Ms. Peirson's RFC, accepting Dr. Kladder's report as is—that is, with the "marked" notation.

### C. Dr. Anderson's Mental RFC

Ms. Peirson also argues that the ALJ was simply wrong in concluding that Dr. Anderson's Mental RFC "does not support claimant's allegations of disability." *Id*. at 21. Again, the Court disagrees. Dr. Anderson did opine that Ms. Peirson had serious limitations in a number of categories relating to her mental abilities to perform unskilled work, including, among

10

others: 1) her ability to ask simple questions; 2) her ability to deal with normal work standards; and 3) her ability to work with others without being distracted. *See id.* at 356. Nevertheless, Dr. Anderson concluded that while Ms. Peirson was seriously limited in these areas, she was not precluded from being able to perform these tasks—as the Commissioner notes, there are two categories above the "seriously limited, but not precluded" ranking: "Unable to meet competitive standards" and "No useful ability to function." *See id*.

Ms. Peirson also argues that "[t]he ALJ rejected the vocational expert's opinion," Pl.'s Reply at 5, when she was asked if someone with these serious limitations could work. While the VE did note that working would be "difficult" for someone with these serious limitations, she noted this was relative to the various work limitations that might be imposed. *See* R. at 66 ("No, that's not my answer, there are no jobs. But my answer is there's just very various work limitations."). To this point, the ALJ specifically restricted Ms. Peirson's work environment, accounting for the serious limitations Dr. Anderson found:

> Claimant is able to perform simple, unskilled work where interpersonal contact with others is routine, superficial and incidental to work performed, and where she works with only a relatively small number of people. She is also limited to low stress work that requires a regular work break approximately every 2 hours.

*Id*. at 19-20. The Court sees no error in the ALJ concluding that while Dr. Anderson's report noted various serious limitations, it did not support a finding of total disability.

### D. Jean Manis

Ms. Peirson next argues that the ALJ erred in failing to consider Ms. Peirson's social worker's notes and testimony. Ms. Peirson concedes that Ms. Manis is not an "acceptable medical source" as defined in 20 C.F.R. § 404.1513; rather, as a social worker, Ms. Manis is considered an "other source." Social Security Ruling ("SSR") 06-03p states that information from these other sources "may provide insight into the severity of the impairment(s) and how it

11

affects the individual's ability to function" and "should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." The Court believes the ALJ has satisfied his obligation in this regard and disagrees with Ms. Peirson's interpretation of the ALJ's treatment of Ms. Manis' notes and testimony as a "rejection." The ALJ discussed Ms. Peirson's treatment notes from the Anderson Clinic at length in his decision, *see* R. at 24; however, because Ms. Manis' opinions were based solely on Ms. Peirson's statements and not on any other evidence or testing, he assigned her opinion little weight. This was not an error. *See e.g.*, 20 C.F.R. § 404.1527 ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").[3]

### E. Ms. Peirson's Onset Date

Finally, Ms. Peirson argues that the ALJ committed harmful error by not amending her date of onset to October 1, 2009, as he indicated he would do at the hearing. She stated she was harmed by this because, "[i]t is possible that the Commissioner could argue that since Mr. [sic] Peirson was not disabled on January 1, 2006 the Unfavorable Decision stands (notwithstanding the occurrence of a later disability)." Pl.'s Reply at 7. Inasmuch as the Commissioner *does not* argue that Ms. Peirson's decision should stand because she was not disabled as early as January

---

[3] While this provision specifically addresses one factor an ALJ should consider when evaluating "acceptable medical sources," ALJs are to use the same factors when evaluating "other sources." *See* SSR 06–03p; *Phillips v. Astrue,* 413 Fed. Appx. 878, 884 (7th Cir. 2010) ("In deciding how much weight to give to opinions from these 'other medical sources,' an ALJ should apply the same criteria listed in § 404.1527[.]").

1, 2006, this argument has no merit. Ms. Peirson has failed to show any actual harm resulting from this oversight.

## IV. CONCLUSION

As set forth above, the Appeals Council concluded that the ALJ erred in correcting Dr. Kladder's report; however, the Appeals Council did not adequately remedy that error. Accordingly, this cause is **REVERSED AND REMANDED** such that the ALJ can either contact Dr. Kladder to clarify the discrepancy, as the Appeals Council suggested, or reevaluate Ms. Peirson's RFC, accepting Dr. Kladder's report as is.

SO ORDERED: 02/24/2014

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.